**FUTURA DEVELOPMENT OF PUERTO RICO, INC., Plaintiff,**

v.

**ESTADO LIBRE ASOCIADO DE PUERTO RICO, et al., Defendants.**

Civil No. 92–2534(SEC).

United States District Court, D. Puerto Rico.

March 18, 1997.

---

**10.** Attorney GARCIA was petitioner's court-appointed counsel in the underlying criminal proceedings.

Harry E. Woods, Woods & Woods, Hato Rey, PR, for plaintiff.

Mayra Maldonado–Colon, Dept. of Justice, Federal Litigation Div., San Juan, PR, Carlos Del–Valle–Cruz, San Juan, PR, for Estado Libre Asociado de Puerto Rico, Administracion de Fomento Cooperativo, Compania de Desarrollo Cooperativo, Rafael Hernandez–Colon, Lila Mayoral–de–Hernandez, Conj. Part. Hernandez–Mayoral, Hector Rivera–Cruz, Sonia I. Rosario, Conjugal Partnership Rivera–Rosario, Jesus I. Feliciano–Oliveras, Jose M. Berrocal.

Mayra Maldonado–Colon, Dept. of Justice, Federal Litigation Div., San Juan, PR, for "Janet" Feliciano, Conjugal Partnership Feliciano–Feliciano, "Judith" Berrocal, Conjugal Partnership Berrocal–Berrocal.

## OPINION AND ORDER

CASELLAS, District Judge.

This case is before the Court on plaintiff's request for reconsideration of our denial of a motion for partial summary judgment (**Dockets # 18,99**). Plaintiff contends that the Commonwealth of Puerto Rico ("the Commonwealth") should be held accountable for the payment of a prior judgment by this Court, which declared the Cooperative Development Company ("CDC") liable to plaintiffs in the amount of $12.3 million, plus interest, and which CDC has been unable to pay because of insufficient assets.[1]

Upon careful examination of the parties' arguments as well as the relevant facts and the applicable law, this Court finds that plaintiff's motion should be **GRANTED**. In doing so, we heed Justice Burger's dissenting opinion in *Complete Auto Transit. Inc. v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981), in which he stated that "we have moved away.from 'The King can do no wrong.' Th[e] principle of individual accountability is fundamental if the structure of an organized society is not to be eroded to anarchy and impotence, and it remains essential in civil as well as criminal justice." *Id.* at 429, 101 S.Ct. at 1851.

### Jurisdiction

Federal Courts have jurisdiction to entertain supplemental actions "in aid of and to effectuate [their] prior decree[s] to the end either that [they] may be carried fully into execution or that [they] may be given fuller effect ..." *Dugas v. American Surety Co. of New York*, 300 U.S. 414, 428, 57 S.Ct. 515, 521, 81 L.Ed. 720 (1937). Such bills are "ancillary and dependent, and therefore the jurisdiction follows that of the original suit, regardless of the citizenship of the parties to the bill[s] or the amount in controversy." *Id.* See also *Crosby v. Mills.* 413 F.2d 1273 (10th Cir.1969). Were that not the case, "[t]he judicial power would be incomplete, and entirely inadequate to the purposes for which it was intended." *Sandlin v. Corporate Interiors. Inc.*, 972 F.2d 1212, 1216 (10th Cir.

---

1. *See U.S.I. Properties Corp. v. M.D. Construction Company. Inc.; et al.*, 83–2647(JAF). As of 1992, when this case was filed, the debt already amounted to at least $20 million. According to plaintiff, the per diem interest rate is accruing at $4,032.79.

1992) (*referring to Bank of the United States v. Halstead,* 10 Wheat. 51, 23 U.S. 51, 53, 6 L.Ed. 264 (1825)).

■ Notwithstanding the forgoing, a party who asserts a post-judgment claim against a non-party which does not arise out of the operative facts that produced the original judgment must demonstrate an independent basis for federal jurisdiction. *Sandlin,* 972 F.2d at 1216. "When post-judgment proceedings seek to hold non-parties liable for a judgment on a theory that requires proof on facts and theories significantly different from those underlying the judgment, an independent basis for federal jurisdiction must exist." *Id.* at 1217.

Given that plaintiff in the above-captioned matter asserts that the CDC—the judgment debtor—is the alter ego of the Commonwealth, who was not a named party to the previous action, this Court's jurisdiction over the instant action is contingent upon our determination that CDC is the alter ego of the Commonwealth, and that we are therefore, dealing with one and the same defendant. For the reasons stated below, this Court holds that CDC is an alter ego of the Commonwealth and that therefore, the latter was a *de facto* party to the original action. Supplemental jurisdiction does exist.

**Procedural Background**

This is the aftermath of the well publicized controversy over the "Ciudad Cristiana" housing project, which culminated in a trial that lasted five and a half weeks and resulted in a $12.3 million verdict for plaintiff, U.S.I. Properties Corporation, and co-defendant, MD Construction Company.[2]  *See U.S.I.*

Properties Corp. v. M.D. Construction Co., 83–2647(JAF). Defendant CDC appealed from that judgment, which was affirmed in *U.S.I. Properties Corp. v. M.D. Construction Company. Inc.,* 860 F.2d 1 (1st Cir.1988). The United States Supreme Court denied CDC's petition for certiorari. *See Compania de Desarrollo Cooperativo v. U.S.I. Properties Corp.,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989).

Ten long years have already gone by since the original judgment was entered. In this, the latest chapter of the Ciudad Cristiana saga, Futura claims that it has been unable to collect any money at all because of CDC's insolvency. According to plaintiff, it is the Commonwealth who should be held accountable for the judgment because (a) the Cooperative Development *Company* ("CDC"), technically a public corporation under Puerto Rico law, is actually the alter ego of the Cooperative Development *Administration* ("AFC"), an agency which is an integral part of the Commonwealth government; (b) through its conduct before, during and especially after the *U.S.I. Properties* trial, the Commonwealth demonstrated that it had absolute control over CDC and the entire Ciudad Cristiana litigation, to the point that it milked CDC of all its assets to preclude payment of the judgment; and (c) through such behavior, the Commonwealth voluntarily submitted itself to the jurisdiction of this Court and thus waived its Eleventh Amendment immunity.[3] We will analyze plaintiff's contentions in the order in which they have been alleged.

**Summary Judgment Standard**

As noted by the First Circuit,

**2.** CDC had agreed to finance M.D. Construction's building of a 700–unit low income housing project, but after 480 units were completed, CDC stopped financing the project. Such an action forced M.D. to default on its payment obligations to U.S.I, the owner of the land, and this led to the filing of the original suit. One of CDC's main defenses was that the land used to develop the Ciudad Cristiana project was contaminated with mercury. After a protracted litigation, the District Court held CDC responsible for its breach of contract. For a more detailed analysis of this litigation, please refer to *U.S.I. Properties Corp. v. M.D. Construction Company, Inc.,* 860 F.2d 1 (1st Cir.1988). M.D. Construction was subsequently merged into Futura Development of Puerto Rico,

which became the judgment creditor against CDC.

**3.** Although plaintiff also sued various government officials for violations of civil rights, due process, equal protection, fraud and other torts, it acknowledged that "the heart and soul of the case is the alter ego relationship between the ELA, its agency, Administracion de Fomento Cooperativo (AFC) and CDC because it is through this relationship that the Commonwealth sought to accomplish, and did accomplish, its objective of not paying the MD Judgment and, equally important, of seeing to it that the MD Judgment was not paid (**Docket # 18, at 4–5**)."

[s]ummary judgment has a special niche in civil litigation. Its "role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

*McCarthy v. Northwest Airlines. Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving pain, is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir. 1992). See also, *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Govern-ment Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

Recent case law has also established that "summary judgment may be appropriate '[e]ven in cases where elusive concepts such as motive or intent are at issue ... if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation'." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco, Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

In determining whether to grant summary judgment, the Court may not, however, weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* at 684 (citing *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

In his second motion for reconsideration, plaintiff asserts that this Court should consider its summary judgment motion unopposed because defendants never submitted a statement of disputed material facts to counter plaintiff's more than 117 exhibits or its statement of uncontested material facts, even though Magistrate Justo Arenas ordered them to do so on August 8, 1995.[4]

This Court has expressed that a non-moving party's failure to comply with Local Rule 311.12 will result in the admission of the moving party's list of uncontroverted facts.[5]

---

4. The instant case was referred to Magistrate Justo Arenas for a report and recommendation on the parties' numerous motions to dismiss and for summary judgment. Upon analyzing these motions, Magistrate Arenas recommended that the dismissal of the alter-ego cause of action be denied until the Court determined whether CDC was the alter ego of the Commonwealth and whether it had waived its Eleventh Amendment immunity. As to the remaining causes of action, Magistrate Arenas recommended that they be dismissed (**Docket # 62**). In an opinion and order issued contemporaneously, Magistrate Arenas reprimanded both parties for failing to submit their respective Rule 311 statements in a timely manner (**Docket # 61**). Although plaintiff complied with this order shortly thereafter, defendant has yet to do so.

5. Local Rule 311.12 provides that:
[u]pon any motion for summary judgment, there shall be served and filed annexed to the motion a separate, short, and concise statement of the material facts as to which the

*Tavarez v. Champion Products. Inc.*, 903 F.Supp. 268, 270 (D.P.R.1995). "Although this omission does not signify an automatic defeat, it launches the non-movant's case down the road towards an easy dismissal." *Id.* Such is the scenario in the present case.

We further note that Local Rule 311.12 has the force of law. *See* Fed.R.Civ.P. 83; 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3153 at 224 (1st ed.1973) ("[b]ecause local rules do have the force of law, they should be held to be binding upon the parties and upon the court that promulgated them until they are changed by a majority of the judges in the district.").[6] Accordingly, all material facts set forth in plaintiff's statement of undisputed material facts and which were not separately and expressly controverted by defendant will be deemed admitted. *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 816 n. 2 (1st Cir.1991); *Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 19 (1st Cir. 1989). There being no genuine issues of material fact, the case is ripe for summary judgment. We need only examine whether given the facts, the movant is entitled to judgment as a matter of law.

**Applicable Law/Analysis**

*1. Whether CDC is the alter ego AFC, and consequently, of the Commonwealth*

The First Circuit has consistently treated Puerto Rico as if it were a state for Eleventh Amendment purposes.[7] *See, e.g., Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority*, 991 F.2d 935, 939 (1st Cir.1993). Pursuant to this holding, the Court has repeatedly held that "whether a local entity 'is to be treated as an arm of the state partaking of the State Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend ... depends, at least in part, upon the nature of the entity created by state law'." *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 516–17 (1st Cir.1986); (citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)). *See also In re San Juan Dupont Plaza Hotel v. Tourism Company of Puerto Rico*, 888 F.2d 940 (1st Cir.1989).

Some of the factors which have been taken into consideration when determining whether a particular entity is a state's alter ego entitled to Eleventh Amendment immunity are "whether it performs a governmental function, whether it functions with substantial autonomy, to what extent it is financed independently of the state treasury, and if a judgment sought to be entered against the agency will be satisfied out of the state treasury." *Figueroa–Rodriguez v. Aquino*, 863 F.2d 1037, 1042 (1st Cir.1988); *Culebras Enterprises*, 813 F.2d at 517. Also important are factors such as "whether [the entity] has

---

moving party contends there is no genuine issue to be tried and the basis of such contention as to each material fact, properly supported by specific reference to the record. All material facts set forth in the statement required to be served by the moving party shall be deemed to be admitted unless controverted by the *statement required to be served by the* opposing party. The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, properly supported by specific reference to the record.

6. The First Circuit has also stressed the importance of the parties' compliance with procedural rules. In *Reyes–Garcia v. Rodriguez & Del Valle, Inc.*, 82 F.3d 11 (1st Cir.1996), the Court noted that:

[p]rocedural rules are important for two overarching reasons. One reason is that rules en-

sure fairness and orderliness. They ensure fairness by providing litigants with a level playing field. They ensure orderliness by providing courts with a means for the efficient administration of crowded dockets. In both these respects rules facilitate the tri-cornered communications that link the opposing parties with each other and with the court. The second overarching reason why procedural rules are important has a functional orientation: rules establish a framework that helps courts to assemble the raw material that is essential for forging enlightened decisions. *Id.* at 14.

7. Plaintiff requests that we challenge the forgoing holding based on the premise that Puerto Rico is a territory, subject to rules different from those of the fifty states. This Court declines plaintiff's invitation to question such a longstanding holding.

the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the [entity's] operations." *In re San Juan Dupont Plaza Hotel,* 888 F.2d at 942 (citing *Ainsworth Aristocrat International Party v. Tourism Co.,* 818 F.2d 1034, 1037 (1st Cir.1987)).

In *Culebras Enterprises,* the First Circuit held that the Culebra Conservation and Development Authority was the alter ego of the Commonwealth based on factors such as that: (a) it was attached to the Department of Natural Resources of Puerto Rico, where its main offices were located; (b) its board of directors included the Secretary of Natural Resources, presiding, and six others who were appointed by the Governor of Puerto Rico; (c) it was in charge of the formulation, adoption and administration of plans and programs for the conservation, use and development of Culebra, and of carrying out the public policy of the Commonwealth; (d) its property was exempt from taxation; (e) it could accept donations in the name of the Commonwealth; (f) it could acquire property through condemnation; (g) its president certified that the agency would not have the funds to satisfy a judgment and that such would have to be satisfied from the general budget of the Commonwealth; and (h) the entity did not have financial independence since it received its fluids from the state treasury provided yearly in the general budget. *Id.* at 517. The Court ruled that, given the forgoing, it did not really matter that the Authority had the capacity to sue and be sued in the Puerto Rico courts. *Id.*

Similarly, in determining whether the Puerto Rico Tourism Company was an arm of the state, the court in *In re San Juan Dupont Plaza Hotel* considered that (a) there was constant communication between the executive branch and the agency's head; (b) the Governor appointed the members of the Tourism Company's board of directors; (c) the Governor determined who the Executive Director would be; (d) the Governor exercised significant control over the planning and administration of the Tourism Company's policies; (e) three fourths of the Compa-

ny's revenues came from the general fluid of the Commonwealth through joint resolutions passed by the legislature every year; and (f) the company's director testified that payment of any judgment against the Tourism Company would have to be made by the Commonwealth. *Id.* at 943. Given these factors, the First Circuit held that the Tourism Company was immune from suit under the Eleventh Amendment notwithstanding the fact that the Puerto Rico law specifically provided that the Commonwealth would not be liable for the debts of the Company. *Id.*

Both of these cases are remarkably analogous to the case at bar. To begin with, the Supreme Court of Puerto Rico has commented that the CDC enabling statute is extremely vague. In *Cintron Ortiz v. Compañia de Desarrollo Cooperativo,* CE–92–575, the Supreme Court noted that the statute was "extremely confusing in that it does not clearly define whether the Cooperative Development Company is or isn't an instrumentality of the Commonwealth." Moreover, this Court already held that as an agency, the Cooperative Development Administration ("AFC"), to which CDC is attached, was an integral part of the Commonwealth government. See *Cancel v. San Juan Construction Co.,* 387 F.Supp. 916, 918–19 (D.P.R.1974).

More importantly, however, are the following factors: (a) CDC's financial statements reveal that the company's principal source of income comes from appropriations made by the Legislative Assembly of the Commonwealth. In fact, the amount of CDC's capital that is derived from legislative appropriations has been estimated at 97% of its total capital (**Docket # 38, at 70–71**); (b) the Commonwealth has acknowledged that additional special annual appropriations are made to certain component units (like CDC) to enable them to pay their debts (**Docket # 88, at 55**); (c) CDC's financial statements refer to CDC as an agency of the Commonwealth dedicated to the development of activities and facilities that foster and accelerate the fastest expansion of the cooperative movement in Puerto Rico (**Docket # 38, at 72**); (c) its enabling act provides that CDC will have a Finance Committee composed of the AFC administrator (who is named by the

Governor of Puerto Rico) and four additional members named by the Governor of Puerto Rico (5 L.P.R.A. § 981d(e)); (d) the administrator of AFC is also the president of CDC (5 L.P.R.A. § 981d(c)); (e) CDC's executive director is named by the administrator of AFC, subject to the approval of the Governor of Puerto Rico (**Docket# 18, at 75**); (f) CDC's accounting system was to be established in consultation with the Secretary of the Treasury of Puerto Rico (5 L.P.R.A. § 981m(b)); (g) all the monies collected by CDC were to be entrusted to a depository recognized for funds of the Government of the Commonwealth (5 L.P.R.A. § 981(a)); (h) CDC's property and activities are exempt from taxes (5 L.P.R.A. § 981r); and (i) CDC is required to submit a financial statement and a transactional report to the Governor of Puerto Rico at the close of each fiscal year (5 L.P.R.A. § 981u). Given the forgoing, this Court has no doubt that, despite the fact that CDC's enabling statute specifically states that the bonds and obligations of the Company will not be paid by the Commonwealth, CDC is indeed its alter ego. The Eleventh Amendment thus comes into play, and so it becomes relevant to determine whether, through its actions, the Commonwealth waived its immunity.

*2. Waiver of Eleventh Amendment Immunity*

■ The First Circuit has often held that "there are apertures in the Eleventh Amendment's protective swaddling. If a case falls within one of these gaps, the Eleventh Amendment will not bar maintenance of the suit in a federal court." *Metcalf & Eddy, Inc.*, 991 F.2d at 938. "Specifically, the amendment's raiment unravels if any one of four circumstances eventuates: a state may randomly consent to suit in a federal forum; a state may waive its own immunity by statute or the like; Congress may sometimes abrogate state immunity; or under certain circumstances other constitutional imperatives may take precedence over the Eleventh Amendment's federal-court bar (citations omitted)." *Id.*

A state may waive its Eleventh Amendment immunity through its conduct. *Garrity v. Sununu*, 752 F.2d 727, 738 (1st Cir.1984). *See also* 13 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3524, at 160 (1984). Courts have, for example, inferred a waiver in cases such as this one, where the state makes a general appearance in federal court and defends a lawsuit on the merits. *Hankins v. Finnel*, 964 F.2d 853 (8th Cir.1992) (referring to *Sosna v. Iowa*, 419 U.S. 393, 396, n. 2, 95 S.Ct. 553, 556, n. 2, 42 L.Ed.2d 532 (1975) and *Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 882–84, 27 L.Ed. 780 (1883)).[8] Furthermore, in cases where a governmental corporation has filed a counter-claim and a third-party complaint, Courts have had "little trouble concluding that [the corporation] voluntarily submitted to the jurisdiction of the federal court, thereby waiving any Eleventh Amendment immunity." *Paul N. Howard Co. v. Puerto Rico Aqueduct & Sewer Authority*, 744 F.2d 880 (1st Cir.1984), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985).

Plaintiff contends that the Commonwealth's conduct prior to, during, and after the trial constitutes an unequivocal waiver of its Eleventh Amendment immunity. We will analyze plaintiff's assertions in that particular order.

That the Commonwealth was behind CDC's daily operations prior to the Ciudad Cristiana litigation is not in question. Plaintiff has already demonstrated that although CDC was in theory, a public corporation, in practice its policy-making endeavors were controlled by the Commonwealth. Furthermore, ninety-seven percent of its income came from yearly legislative appropriations.[9] Its financial statements for fiscal year 1987–

---

8. We note that in *Hankins*, the state appeared ex parte; whereas in this case, the state has appeared through its agency. For the reasons stated herein, however, *and given the particular facts of this case*, we believe this difference is insignificant.

9. For example, a 1974 Joint Resolution of the Puerto Rico Legislature appropriated $3,500.000 to pay for certain CDC debts. In its statement of motives, the joint resolution states that "had these debts not been paid, not only the company's credit but also the Commonwealth's credit would have been affected (**Docket # 15, Exhibit 11**)."

88 specifically describe CDC as an agency of the Commonwealth which is financially maintained by legislative funds (**Docket # 38, Exhibit 2**). It is precisely for the forgoing reasons that we have held CDC to be the alter ego of the Commonwealth.

The important question, however, is whether at the time of the Ciudad Cristiana litigation, the Commonwealth acted as though it were defending an agency and, consequently, its own coffers. Plaintiff avers that although the Commonwealth never appeared as a party in the original litigation, it was the mastermind behind CDC's legal strategy. As an example, plaintiff asserts that César Estrada, CDC's president, admitted in a deposition that he had never read any documentation regarding the Ciudad Cristiana case because they were in the Secretary of Justice's possession (**Docket # 13, Exhibit 3**). Estrada also acknowledged that all he knew from the case he had read in the newspapers (**Docket # 13, Exhibit 9**).

Most strikingly, plaintiff brings to our attention the fact that, in his closing arguments, counsel for CDC told the jury to make sure they understood that it was *the government of Puerto Rico* and consequently, its taxpayers, who were going to foot the bill if CDC was found responsible (**Docket # 13, Exhibit 18**). Plaintiff additionally points out that since CDC had been undercapitalized almost from its inception, Futura planned to attach the assets and/or require the posting of a *supersedeas* bond during the appellate process, but decided against it based upon CDC counsel's promise that the Commonwealth would include payment of the Ciudad Cristiana judgment in its budget (**Docket # 11, at 29**).

Plaintiff also notes that after judgment against CDC was entered in 1987, the appeal to the First Circuit, and subsequently, to the United States Supreme Court was handled by the Secretary of Justice and paid for by the Government of Puerto Rico. Moreover, plaintiff directs us to a post-judgment order by Judge José A. Fuste, who presided over the original litigation, in which he observes that "CDC, as an entity, had little or no

intervention in the decision to deal with this unfortunate controversy the way that we saw it at trial.... [The] major litigation decisions rested with counsel, the law firm of Ramirez & Ramirez, and the local Department of Justice (**Docket # 13, Exhibit 4**)." [10]

Given the breadth of the Eleventh Amendment's protective mantle when it comes to the issue of waiver, the forgoing facts might not, standing alone, suffice to demonstrate a waiver through conduct. It is, however, the Commonwealth's course of conduct once the judgment against CDC became final that tips the balance in favor of plaintiff's argument and confirms any doubts which might have existed up to this point as to the Commonwealth's waiver.

After the Court entered its judgment against CDC in 1987, the company's Executive Director wrote the Governor to express concern about the agency's financial situation and the possibility that CDC's assets might be attached, affecting its operations and having an adverse ripple effect on other agencies, the government, and even private entities. Given CDC's precarious situation, he specifically requested a special monetary appropriation from the Commonwealth for the purpose of paying the Ciudad Cristiana debt (**Docket # 15, Exhibit 25**). Shortly thereafter, one of the Governor's aides referred the request to the Director of the Office of Budget and Management ("OBM"), asking him to deal with this situation which according to him, deserved special attention (**Docket # 15, Exhibit # 21**). Apparently, no further action was taken at the time.

In 1992, however, the director of the OBM prepared a proposed bill which provided for the liquidation and dissolution of CDC, as well as for the naming of a special trustee to carry out the liquidation, and sent it to the Governor's office (**Docket # 15, Exhibits 15–18**). In his letter, the Director of the OBM stated that the purpose of the liquidation proceedings would be to ensure compliance with the greatest possible number of CDC's

10. The law firm of Ramirez & Ramirez represented CDC in the original litigation and was the Commonwealth's legal counsel in this case until January 4, 1993.

financial obligations without jeopardizing the Commonwealth's assets. *Id.*[11]

Thus, despite CDC counsel's earlier assurances that the government of Puerto Rico would pay for the Ciudad Cristiana judgment, not only did the Commonwealth not follow through on its promise. but it selectively decided which of CDC's debts it would satisfy, and made annual appropriations to settle only those debts.[12] Some of CDC's post-judgment unaudited financial statements even disregard the debt relating to the Ciudad Cristiana litigation. For example, the Commonwealth reported CDC's debt as of June 30, 1991 to be $1,400,000, even though the debt at the time, including the Ciudad Cristiana judgment, surpassed $19,000,000 (**Docket # 15, Exhibit 56, at II–39**). Moreover, CDC listed its 1988 budget at $5,465,652.00, its 1989 budget at $4,126,413.00, and its 1990 budget at *zero* (**Docket # 15, Exhibits 58–60**). By substantially reducing CDC's legislative appropriations, as well as its budget, the Commonwealth, under its protective mantle, in effect allowed the company to gradually become insolvent and financially unable to pay the Ciudad Cristiana debt. Thus by 1993, its financial statements reflected a net loss of $40.8 million and an accumulated capital deficit of $21 million (**Docket # 38, Exhibit 3**).

The forgoing facts all reflect that, as plaintiff claims, the Commonwealth engaged in a pattern of conveniently allowing CDC to fall into insolvency by refusing to provide the company with the necessary and customary appropriations, thus letting CDC's debts mount, wiping out its capital, and in effect, precluding the possibility of satisfying plaintiffs judgment, which constituted the lion's share of CDC's debt.

In addition to allowing CDC to be literally driven to the ground, the Commonwealth stripped the agency of its employees and transferred them to AFC. Thus, while CDC's 1988 budget lists the total number of employees at 28, its 1989 budget listed it at 23 and its 1990 budget listed it at *zero* (**Docket # 15, at 58**). Meanwhile, AFC's personnel list increased from 135 in 1988 to 157 in 1989 (**Docket # 15, Exhibit 59**). Moreover, if one examines the 1992–93 telephone directory, CDC appears listed with a phone number of 763–2009 for the switchboard and 759–9624 for its president; the same numbers listed for AFC. An identical listing appears in the 1993–94 directory, but surprisingly, CDC is not listed in the 1994–95 directory, despite the fact that the planned dissolution of CDC never materialized (**Docket # 38, Exhibits 5–7**).

Further evidence of the questionable nature of CDC's de facto liquidation is the fact that in 1993, the Comptroller's office reported that CDC had violated the purpose for which it was created and engaged in a serious misuse of funds which led to its remaining inoperative since 1989 without undergoing appropriate liquidation proceedings (**Docket # 15, Exhibit # 72**). As a result of these findings, the Senate requested further information from the OBM. In response to this request, the OBM Director informed that CDC had not been included in the 1993–94 budget because the company had been liquidated and was inoperative since fiscal year 1989–90. While stating that the Commonwealth would not be responsible for CDC's debts, the Budget Director admitted that the legal basis for the company's liquidation and divestiture of its assets had been the federal court judgment against CDC (**Docket # 18, Exhibit 3**). The Senate's dissatisfaction with OBM's letter led to the filing of a petition to the Senate in October of 1993, to request that OBM provide additional information pertaining to the liquidation of CDC. (**Docket # 18, Exhibit # 4**). Accord-

---

11. It is interesting to note that the Company's 1992–1993 financial statements reflected a net loss of $40.8 million and an accumulated capital deficit of $21 million.

12. As evidenced in our footnote # 8, this course of conduct is far removed from what had been the governmental policy prior to the Ciudad Cristiana judgment. In fact, the Commonwealth has historically come through to pay for the debts of its public corporations in order to guarantee that the credit of the corporations and the government remains in good standing. For example, the Commonwealth paid for the debts of corporations such as CRUV, the Metropolitan Bus Authority, the Commercial Development Co. and the Sugar Corp. after the Ciudad Cristiana judgment took effect (**Docket # 88, at 66–67**).

ing to the record, however. no further action was taken on this matter.

Perhaps if we were to isolate each one of these incidents in our determination of whether to infer an Eleventh Amendment waiver, it would be difficult to do so. Nevertheless, taken together, the Commonwealth's actions unequivocally demonstrate that the government had total control over CDC its policy strategies, its litigation tactics, and even its existence. More importantly, the forgoing facts illustrate that the Commonwealth vigorously supported CDC: it stood behind CDC in filing an action of questionable merit in this Court, and when that backfired and resulted in an adverse judgment of $12.3 million, it sought to preclude collection of the same.

The Commonwealth simply cannot expect to act as CDC's alter ego throughout the Ciudad Cristiana litigation in an effort to increase its own coffers, and hope that, when its plan boomerangs, this Court tolerates its effort to distance itself from CDC by pleading and interposing Eleventh Amendment immunity. As Chief Judge Torruella stated in his dissenting opinion in *Figueroa–Rodriguez v. Aquino,* 863 F.2d 1037 (1st Cir.1988), "[h]aving one's cake and eating it, too, is not in fashion in this [Court]." *Id.* at 1052, referring to *United States v. Tierney,* 760 F.2d 382, 388 (1st Cir.1985).

Based on the forgoing, we hereby hold that the Commonwealth waived its sovereign immunity as to this case and must be responsible for the $12.3 million judgment, plus interest. Plaintiff's motion for partial summary judgment is hereby **GRANTED.**

### Other Claims

Although in its second motion for reconsideration (**Docket # 99**), plaintiff merely requests that this Court rule on its motion for partial summary judgment (**Docket # 18**), we will examine the remaining claims to determine whether in its amended complaint, plaintiff cured the defects which caused these causes of action to be dismissed under Rule 12(b)(6) on September 29, 1995 (**Docket # 75**), pursuant to Magistrate Justo Arenas' Report and Recommendation (**Docket # 62**).

It is a well established principle that "[e]ven if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair." 5A Wright & Miller, *Federal Practice & Procedure* § 1357, at 301 (2d ed.1990). The First Circuit has allowed *sua sponte* dismissals of complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure as long as the parties have been afforded notice and an opportunity to amend the complaint or otherwise respond. *Wyatt v. City of Boston,* 35 F.3d 13, 14 (1st Cir.1994).

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must assume that plaintiff's allegations are true and draw all reasonable inferences in its favor. *Correa–Martinez v. Arrillaga Belendez,* 903 F.2d 49, 51 (1st Cir.1990). Although the Court will not credit bald assertions or mere specious allegations, it will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Plaintiff filed the complaint in the instant action on October 28, 1992. Besides the alter-ego claim which we disposed of above, plaintiff filed a claim against various government officials in their official and personal capacities for violations of (a) the equal protection clause; (b) the takings clause: (c) the due process clause; and (d) plaintiff's civil rights. Plaintiff also included a claim for loss of reputation through tortious interference. Upon receipt of various motions to dismiss and for summary judgment, the Court referred this matter to Magistrate Justo Arenas for a Report and Recommendation. On August 9, 1995, Magistrate Arenas recommended that the case be dismissed as to all but the first (the alter ego) cause of action. The Magistrate essentially held that plaintiff had "failed to plead any factual allegations which establish some sort of causal nexus or connection between the named defendants' conduct and the [alleged violations] (**Docket # 62**)." On September 29, 1995, we adopted

his report and recommendation and entered partial judgment against plaintiff. Subsequently, however, we granted plaintiff an opportunity to submit an amended complaint to cure the defects which caused its complaint to be dismissed. The amended complaint was filed on February 13, 1996. It is over one hundred pages long and it includes causes of action under the alter ego doctrine, discussed above, as well as for equal protection, due process and civil rights violations. Plaintiff additionally includes claims for impairment of contracts obligations; loss of reputation and credit by tortious interference; as well as claims under local tort law (**Docket # 88**).

Although substantially longer than the original complaint, the amended verified complaint does not, however, cure the defects of the original one. Plaintiff fails to draw a nexus between the individual defendants and the government's scheme to preclude payment of the judgment in his favor. It merely realleges the same claims which it averred in the original complaint, detailing some of the examples alleged in the first cause of action against the Commonwealth. For example, in its equal protection claim, plaintiff asserts that the individual defendants "deliberately, intentionally and purposefully showed, preferred, and practiced undue individual and/or class favor in the payment, and/or causing the payment, of obligations and debts of CDC to the other creditors of CDC, while at the same time showed and practiced hostile discrimination and/or oppression and unequal treatment under the law to judgment creditor Futura (**Docket # 88, at 39**)." Plaintiff does not specify who performed which acts. As much as this Court believes that plaintiff has made a strong showing that he has a cause of action against the Commonwealth for the payment of the Ciudad Cristiana judgment, we do not think his remaining claims, filled with conclusory assertions and specious allegations, warrant the same treatment. Plaintiff had ample time to substantiate his claims and cure any defects which might have caused the previous dismissal, and yet he failed to do so. Thus, upon close scrutiny of the first amended complaint, this Court finds that it suffers from the same infirmities as the previous complaint and

hereby **DISMISSES** plaintiff's second, third, fourth, fifth, sixth and seventh causes of action. Judgment will be hereby entered accordingly.

**SO ORDERED.**